UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff(s), ) | |
| ) | |
| vs. ) | Case No. 1:06CR 99 ERW |
| ) | |
| CRYSTAL WARREN, ) | |
| ) | |
| Defendant(s). ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The defendant is charged by Indictment with two counts: Count I - Possession With Intent to Distribute 5 Grams or More of Cocaine Base; and Count II - Possession With Intent to Distribute Cocaine. The defendant has filed Defendant's Motion to Suppress Evidence (Document #40). The government has filed Government's Response to Defendant's Motion to Suppress Statements and Evidence (Document #42). An evidentiary hearing followed.

**Factual Background**

On April 17, 2006, DEA Special Agent Bernard Gard was driving his automobile on Bloomfield Road in Cape Girardeau, Missouri. At around 2:05 P.M., Gard saw a blue, two-door Cadillac with dark tinted windows and custom wheel covers enter the U Store & Lock It storage business located at 2301 Bloomfield Road. The Cadillac had a temporary license tag on it of 305G848.

The storage facility has a fence around it with a gated entrance for vehicles. The business office is nearby the entrance. Before a vehicle can enter the storage facility, the driver must punch in a pre-approved code number so the gate will open, allowing access to the car. That code number

is approved by the storage business. The storage units all have doors with hasps that can be fitted with a lock. Individuals can rent these storage units for a monthly fee.

On April 17, 2006, the Cadillac driver pulled up to the gate and entered a code. The gate opened and the Cadillac entered the facility. Gard drove his car into the facility while the gate was still open. The gate shut behind Gard's vehicle. Gard drove around the storage buildings.

Gard saw the Cadillac parked at the far end of the storage buildings in front of Storage Unit 349 with its passenger door open. Unit 349 was also open. Gard could see another vehicle in the unit with its lights on.

Gard went to the gate and waited for someone to punch in a code so he could leave. Shortly after that, the Cadillac appeared at the gate. The driver punched in a code and drove out of the area. Gard then drove through the gate. When Gard got through the gate, he noticed that the Cadillac had stopped. The driver of the Cadillac, a black male, got out of the car and approached Gard's car. The person asked Gard why Gard did not have a security code for the gate. The person also demanded that Gard get out of his car and wait for the police. Instead, Gard drove off.

Gard waited until the Cadillac had left the area and contacted Alberta Gwin at the storage facility business office. She told Gard that the renter of Unit 349 was Clifton Brown. She provided Gard with a copy of Brown's driver's license. Gard noticed that the person shown on Brown's driver's license photo was the same person that contacted him earlier at the gate. Gwin stated that Brown rented the unit for $140 per month and always paid on time and in cash. Brown had rented a unit since January. Another business employee obtained a record showing the times that Brown had entered the storage facility during the past 45 days. The record showed that a person using Brown's security code had entered the facility 76 times in those 45 days, mostly between 4:00 P.M. and 4:00 A.M.

Gard asked that a dog capable of detecting controlled substances be brought to the storage facility. Cape Girardeau Police Officer Bourbon brought his drug dog to the area. Bourbon brought the dog around the front of the storage units. At Unit 349, the dog gave a positive indication of controlled substances in Unit 349 by scratching and barking aggressively at the door to that unit. Cape Girardeau Police Officer Rahn appeared with his drug dog. That dog also indicated the presence of controlled substances at the door to Unit 349.

Cape Girardeau Detective Dan Seger was apprised of the situation. He made application for a state search warrant for Unit 349 to a local judge in Cape Girardeau County. Seger signed an affidavit attached to that application. That application was approved at around 5:00 P.M. on April 17, 2006, the same day as Gard's contact with Brown. The officers immediately went to the storage facility and began their search.

The officers had to cut the lock off the door to Unit 349. They went in and found the following:

    a Norinko, SKS assault rifle, bearing serial number 94144383; and
    a Ruger, Model 10-22 rifle, bearing serial number 12688112; and
    a Marlin, .22 caliber, Model 60 rifle, bearing serial number 6414828; and
    a Mossberg, Model 835, 12 gauge shotgun, bearing serial number UM182112; and
    numerous rounds of ammunition, including rounds of .38 caliber, .45 caliber, 7.62
        caliber and 12 gauge shotgun shells; and
    a red backpack containing:
        four packages of marijuana weighing 2313 grams (approximately 5 pounds);
            and
        two empty vacuum type bags;
    a blue tote box containing:
        a digital scale with cocaine residue; and
        an empty box for a Triton T-2 digital scale; and
        a box containing .38 Special ammunition; and
        a small quantity of marijuana; and
        numerous sandwich baggies
    a 1998 Chevrolet Tahoe, bearing license plate number 721-2589.

All of the above listed items were seized.

The officers made contact with the storage lot employees and told them that they were interested in talking to Brown if he appeared at the storage facility again. The officers asked the employees to call them if Brown came back to the unit. The officers had some leads on Brown's location in Illinois and tried to locate him that night. However, they were unsuccessful in making contact with Brown on April 17, 2006.

On April 18, 2006, one of the employees from the storage facility called the officers and reported that Brown had just entered the lot, driving the Cadillac. They reported that another car was following Brown. The officers responded to the storage business. The storage lot employee then disabled Brown's code number from the security system, thereby preventing him from leaving the facility. The employee did this action on her own account, without instructions from the officers.

Brown drove to Unit 349 along with the other car, a Buick. Shortly thereafter, Brown drove to the gate, followed by the Buick. He punched in his access code, but the system would not open the gate. Brown went inside the business office. While he was in that office, the police officers arrived. Brown left the office by another door and ran from the area. Some of the officers chased after him.

Other officers, including Mike Alford and Seger, then walked up to the two cars. Crystal Warren was the driver of the Buick. Seger asked Warren for permission to search her car. Warren declined to give that permission. Seger told her that they were calling for a drug dog to come to that location to see if they could detect any controlled substances coming from either of the cars. Seger said that she was free to leave. Warren then walked away from the area.

Officer Bourbon arrived with his drug dog. The dog alerted on the engine compartment of the Buick as being an area with a controlled substance. The hood of the Buick was opened. Under the hood, the officers found a Triton T-2 digital scale along with two baggies of a suspected

- 4 -

controlled substance. One baggie was later confirmed as containing 28. grams of cocaine base. The other baggie contained 22.8 grams of powder cocaine.

One of the officers had a phone number for Warren. He called Warren, told her of the discovery of the narcotics under the hood of the car she was driving, and then asked if she would come to the police station so they could talk with her. Warren agreed. A short time later, Warren appeared at the police station with some members of her family. She was interviewed by Gard, who first gave her a <u>Miranda</u> warning. Warren agreed to make a statement.

Warren told Gard that she and Brown were a couple and that they had a child together. She said they went to the storage unit that day so that Brown could park his Cadillac in the unit. Warren was going to give him a ride in the car she was driving. Warren said that she saw Brown put the packages under the hood of the Buick and that she knew the materials were cocaine.

Brown was later found to be hiding in an apartment at 639 South Spring Street. The renter of that apartment granted the officers permission to search it after Brown came out. The officers went inside and found and seized the following items:

> a Smith & Wesson, .38 caliber revolver, bearing serial number 602265, loaded with five rounds of ammunition, found under a mattress; and
> a Hi-Point, .380 caliber pistol, bearing serial number P712157, loaded with nine rounds of ammunition, found under a bed; and
> an open box of .38 caliber ammunition, containing five rounds, found under a mattress; and
> 2 small plastic baggies of marijuana, found under a mattress.

The renter of the apartment said that the above items were not hers. Brown was interviewed by Gard, after being given a <u>Miranda</u> warning by Gard. Brown admitted that he put the two firearms, the ammunition and the marijuana under the bed and mattress. He admitted that he put the cocaine base and the cocaine powder in the Buick in the engine compartment. Brown stated that he had found the drugs in a backpack along a road and was going to give them to his friends.

A later check of the weapons disclosed that the Ruger, .22 caliber rifle was purchased by Crystal Warren from the Cape Girardeau Wal-Mart.

The officers also discovered that the Buick was registered in the name of Deborah Clark, of 21589 Rail Road Avenue, P. O. Box 71, Unity, Illinois 62993.

## **Discussion**

In the Motion of Defendant to Suppress Evidence, the defendant requests that: (1) any statements she may have made to law enforcement officers be suppressed because those statements were made after the defendant was arrested but before she was given the Miranda warnings**;** (2) all illegal contraband found in the Buick automobile which the defendant was driving be suppressed because the stop of the vehicle was an illegal stop without reasonable suspicion or probable cause; The subsequent seizure and search of the vehicle was an illegal, warrantless search without probable cause. (3) any illegal contraband found in the Buick automobile defendant was driving be suppressed because its seizure was fruit of the poisonous tree resulting from the illegal search of Storage Unit #349 rented by Clifton Brown since the search warrant executed on Unit #349 "failed to describe the place to be searched with particularity."

## **Statements Made by Crystal Warren**

With respect to any statements made at the storage facility when the Buick was blocked from leaving by Defendant Brown's vehicle, including her refusal to allow the Buick to be searched, those took place when Warren was not in custody and was not being interrogated. In fact, she was told she was free to leave and did leave. Both custody of a suspect and interrogation of that suspect are required before the suspect must be given the Miranda warnings. Rhode Island v. Innis, 446 U.S. 291, 297, 100 S.Ct. 1682, 1688 (1980); United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995). Warren's movements were restricted by the fact that she could not drive her automobile away, but

those restrictions were imposed independently by the employee on duty at the storage facility, Lori Malvitz, who cancelled Clifton Brown's access code on her own without being requested or instigated by law enforcement. The Fourth Amendment only applies to governmental action, not that of a private individual who did not act as an agent for the government. United States v. Jackson, 466 U.S. 109, 113-114, 104 S.Ct. 1652, 1656 (1984).

With respect to statements made by Defendant Warren at the Cape Girardeau Police Station, these followed Warren's return to the police station after a call from Officer Alford, who told her that he had her cell phone and that she could come to the police station to get it. He did not actually talk to Warren himself, but the message was relayed to her, and when Warren came to the police station, she was taken into custody for questioning concerning the narcotics found in the car. It was Alford who saw Defendant Warren at the police station and told her they needed to talk to her and she came back to the Sergeant's office. Two of Warren's family members showed up at the police station. Officer Bohnert administered the Miranda warnings to Miss Warren from a card in the interview room before she made any statements. Bohnert testified that Warren said she understood her rights and would talk to them. (Tr. 118). About five minutes into Bohnert's interview of Warren, Agent Gard came into the interview room. Both Seger and Alford were in and out while Warren was being interviewed by Bohnert and Agent Gard. Gard read the Miranda rights a second time to Miss Warren from a card. Warren indicated she understood her rights and wished to continue to speak with the officers. (Tr. 22).

The court finds that the statements given by Crystal Warren at the police station on April 18, 2006, followed her having been given the Miranda warnings two times. She agreed to talk with the officers and there were no signs of coercion or indications that her will was overcome by any actions by law enforcement officers. The court finds that the statements of Crystal Warren at the police

station on April 18, 2006, were made with an understanding of her <u>Miranda</u> rights followed by a knowing waiver of those rights. Consequently, Warren's statements were voluntary. The court finds that Defendant Warren's statements at the police station are admissible.

## **The Seizure of Items in the Buick**

Defendant Warren claims that the seizure of the contraband in the Buick was illegal because the stop of her vehicle was illegal. The seizure was without probable cause or reasonable suspicion that criminal activity was afoot.

Of course, as previously mentioned, the stop was caused by Lori Malvitz, the employee of the storage facility, acting on her own.

The defendant claims that she was not engaging in any suspicious activity and that the subsequent detention of the maroon Buick was unlawful and in violation of the defendant's Fourth Amendment rights.

At the time when Officer Seger first approached Defendant Warren inside the rental facility on April 18, 2006, he knew that both vehicles, Warren's Buick and Brown's Cadillac, came into the fenced area together, they went through the gate at the same time, they had the same direction of travel, both came back to the gate and it appeared to Seger that there was a relationship between the maroon Buick and Mr. Brown. (Tr. 84). There was no indication that Defendant Warren had her own access card or else she could have secured her and Brown's exit instead of having to wait. Seger knew Warren's name was not on the storage unit's lease. (Tr. 86). To all appearances, the vehicles were together. The reason for Brown's frequent trips to the storage facility was to visit Unit #349.

The law enforcement officers all knew that the rifles and shotgun and numerous rounds of ammunition had been found in Unit #349. They knew that four packages of marijuana weighing approximately five pounds and empty vacuum-type bags had been found in the storage unit; they

knew that a blue tote box containing a digital scale with cocaine residue, an empty box for another digital scale, ammunition, marijuana and sandwich baggies were in the storage unit, all indicating an ongoing large-scale drug trafficking operation. The officers had been told that there had been complaints about the numerous visits to Brown's apartment and that a vehicle matching the description of Brown's Cadillac had refused to stop when told to stop, a week prior to the storage unit incident. The officers had every justification to be reasonably suspicious of any other vehicle associating with Brown's vehicle, which was the case with the maroon Buick driven by Warren. The officers had reasonable suspicion that the Buick traveling with Brown's vehicle in and out of the site where the drug trafficking operation was centered, Storage Unit #349, was participating in the same trafficking. The officers could have been subject to criticism had they failed to call for a drug dog to test the exterior of the Buick. As the government points out, if an officer develops a "reasonable, articulable suspicion that a vehicle is carrying contraband, he has justification for a greater intrusion unrelated to the traffic offense." United States v. White, 42 F.3d 457 (8th Cir. 1994), citing United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990). The drug dog arrived within 15 to 20 minutes. (Tr. 88). This is not an excessive length of time to hold a suspicious automobile. In its Response to the Defendant's Motion to Suppress (Document #42), the government cites a number of cases involving longer periods of time which the Eighth Circuit has approved as reasonable for detaining a vehicle while an investigation continues, including periods of 60 minutes and one for 75 minutes. See pages 9 and 10 of Document #42, the Government's Response to Defendant's Motion to Suppress.

Once Officer Bourbon's dog alerted to indicate the presence of illegal drugs under the hood of the Buick, the officers were justified in opening the hood and seizing the baggies containing 28

grams of cocaine base and 22 grams of powder cocaine, along with a Triton T-2 digital scale. United States v. Linkous, 285 F.3d 716, 721 (8th Cir. 2002). All are admissible in evidence.

**Particularity of Search Warrant**

The defendant claims that the search warrant failed to describe the place to be searched with particularity. The court has difficulty understanding this objection to the search warrant. The description in the search warrant is quite detailed:

> The target premises located at 2351 Bloomfield Rd., is a storage unit at a business known as "U Store and Lock It". Storage Unit #349 is a single storage unit. The storage unit is 10' X 40'. Storage Unit #349 is 5 units from the south, and faces east. The storage unit has a green overhead door, and the complex is beige in color. The numbers "349" appear above the green door.

Government Exhibit #3, Search Warrant. This description is more than sufficient.

RECOMMENDATION

**IT IS, THEREFORE, RECOMMENDED** that Crystal Warren's Motion to Suppress Evidence (Document #40) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(l), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

_/s/ Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 3rd day of November, 2006.